### J. B. HARRIS ET AL. v. LEWELLEN HICKS ET AL.

### No. 1616.

**1.  Receiver—Grounds not Authorizing Appointment of—Action Against Executors.**

In an action against executors appointed by a testator without bond, brought by devisees under the will for their interest in the estate, and for partition, the court was not authorized to appoint a receiver pendente lite upon evidence that the executors had paid over money to the surviving wife of the testator, and that one of the executors had occasionally played at cards, when it also appeared from the evidence that the surviving wife had elected not to take under the will; that the amount so paid her was probably much less than her community interest in the property; that she was without ready means and in need of the money for her present support; that the executor charged with gaming had ample means of his own and was a man of strict integrity, and that all three of the executors had been diligent and faithful in their duties as such.

**2.  Same—Bond May be Required, When.**

The appointment of a receiver is not the only remedy for the protection of property pending suit; and the court, it seems, may refuse to appoint a receiver upon condition that the defendant execute a bond to account for the property; and under article 1944, Sayles' Civil Statutes, in cases where no bond had been required of an executor, any person having a claim against the estate may upon proper written showing made in the court where the will was probated obtain an order for the executor to show cause why he should not be required to give bond.

APPEAL from Collin.   Tried below before Hon. J. E. DILLARD.

*Word & Charlton* and *J. O. Terrell*, for appellants.—1.   The court erred in appointing a receiver of the property in controversy, and in ordering the executors of Jim Harris' estate to turn same over to him pending administration on said estate, in the absence of evidence showing an abuse of their trust on part of said executors or that damage or loss was likely to accrue to plaintiffs in case such receiver was not appointed.   Beach on Receivers, secs 596–601.

2.   No bond has been demanded or required of said executors by the County Court of Kaufman County, or by the District Court of Collin County; and no effort has been made by plaintiffs to have them give bond.   Perkins v. Wood, 63 Texas, 398; Revised Statutes, arts. 1944–1946.

*Abernathy & Beverly* and *W. H. Allen*, for appellees.—1.   A receiver may be appointed at the suit of beneficiaries or legatees when the executor or administrator is insolvent and has not given bond, or is guilty of misconduct, or when two executors disagree.   Jerrard v. McKenzie, 61 Texas, 40; 3 Pom. Eq. Jur., p. 361, sec. 1334; 1 Foster Fed. Procedure, sec. 240, p. 395; High on Rec., sec. 706, p. 595; Ball v. Thompkins, 41 Fed. Rep., 492.

2.   The appointment or refusal of a receiver is a matter of sound

judicial discretion, and an appellate court will not interfere with the exercises of this decretion unless it appears that it has been abused. High on Rec., sec. 25, and cases cited; Adams' Equity (8 Am. ed.), 352; Nichols v. Perry Arm Chair Co., 11 N. J. Eq., 126.

FINLEY, ASSOCIATE JUSTICE.—The appellees herein, as heirs of Mary Harris and devisees of Jim Harris, brought this suit in the District Court of Collin County on August 12, 1895, to recover of defendants their alleged interests in their estates, and for partition.

On September 12, 1895, the plaintiffs, except W. P. Harris, filed in said cause their application for a receiver to take possession and control of all the property in dispute pending the suit. The basis of the application was their alleged joint interest with defendants in the property, and the misapplication of trust funds by the executors of Jim Harris' estate, and their refusal to allow plaintiffs free access to the books of Jim Harris, which they alleged to be necessary to the full development of their cause of action, and for the further reason that two of the executors and one of their attorneys are largely indebted to the estate, and one of the executors is of a speculative turn of mind.

On October 12, 1895, defendants filed their plea to the venue, claiming their privilege to be sued in Kaufman County, and also denying the jurisdiction of the court over the subject matter. Reserving their plea of venue, they at the same time demurred and answered to plaintiffs' petition, and also to their application for a receiver.

On January 1, 1896, at Waxahachie, Ellis County, in chambers, the court heard the application for a receiver and the evidence in support of and against it, and granted same, and appointed J. K. Bumpass of Kaufman County, receiver of all the property in dispute pending the suit. Defendants excepted to the action of the court, gave notice of appeal, etc.

The case comes to this court on appeal from the order of the court below appointing a receiver. The material facts bearing upon the action of the court here complained of are as follows:

Jim Harris and Mary Harris were married in 1846, and Mary Harris died intestate in 1860. Unto them were born five children, three of whom are plaintiffs in this suit. The other two died intestate in 1881. Lora Harris is a daughter and only heir of one of these, and Beulah Huddleston a daughter and only heir of the other, and both are plaintiffs herein. No administration was had on the estate of Mary Harris. She and Jim Harris had a community estate consisting of 640 acres of land in Collin County, a herd of cattle, some horses and negroes. The number of cattle and horses and the value of same are uncertain and in dispute.

Jim Harris and Martha Harris married in 1862, and lived together until the death of Jim Harris in 1895. Unto them were born John B. Harris and C. E. Harris, two of the defendants. He (Jim Harris) left a will, dated April 8, 1887, in which he named Geo. H. Jackson and his sons W. P. Harris and John B. Harris as executors thereof, and pro-

vided that no bond be required of them as such, and that no other action be had in the Probate Court than such as might be necessary to the probation of his will and the returning of an inventory and appraisement and a list of claims of his estate. He bequeathed unto his grand-daughters, Lora Harris and Beulah Huddleston, each $1000, and unto his surviving wife Martha Harris a life estate in his interest in all their real estate situated in the corporate limits of the town of Terrell, the remainder to go equally to his five surviving children, W. P. Harris, J. L. Harris, Lewellen Hicks, John B. Harris and C. E. Harris. He also gave unto said Martha all personal property used at the date of his death, in and about their home, such as furniture, carriages, wagons, carriage and riding horses, milk cows and hogs, and other items of like character. All the residue of his estate he bequeathed equally to his said five children, W. P. Harris, J. L. Harris, Lewellen Hicks, John B. Harris and C. E. Harris, and their descendants. He also recited that he had already made advances of land and money to his children, W. P. Harris, J. L. Harris and Lewellen Hicks, and that to make his children, John B. Harris and C. E. Harris equal to the three first named, he gave to said John B. Harris and C. E. Harris, each, 320 acres of good black land of the same kind as that already given to the three first named, said land to be free of all incumbrances, and to be selected by disinterested parties, one of whom shall be selected by W. P. Harris, and the other by John B. Harris, and in case of their failure to agree, they shall choose a third party, a majority of the three to make the selection. He also required that W. P. Harris, J. L. Harris, Lewellen Hicks or her husband, be required to account for all moneys advanced or loaned by him to them, reciting the object to be to give his said five children equal interests in his estate.

At the death of Jim Harris, W. P. Harris, N. T. Hicks, husband of Lewellen Hicks, J. L. Harris and John B. Harris were each indebted to his estate. The will of Jim Harris was, before the institution of this suit, duly probated in the County Court of Kaufman County, and said W. P. Harris, John B. Harris and Geo. H. Jackson were by said court appointed executors thereof, and they qualified and entered upon the discharge of their duties as such. An inventory and appraisement and list of claims were duly made, returned, and approved by the court, as required by law. All the property in dispute was inventoried, appraised and listed as belonging to the estate, and was at the institution of this suit in the possession of said executors. The estate consisted of lands situated in Kaufman, Hunt, Collin, Clay and Montague counties, of the appraised value of $109,703.15, and of personal property of the appraised value of $909.50, and of $35,000 in cash, and of claims aggregating $127,000. The executors apportioned the cash on hand between them, and deposited one-third thereof to the individual credit of each.

John B. Harris and Geo. H. Jackson, without the consent of W. P. Harris, delivered and paid to Martha Harris out of the trust funds re-

tained by them, $15,900. This was done for the reason they considered the funds belonged to the community estate of herself and Jim Harris, and that she was justly entitled to have one-half of same; and for the further reason they feared all funds of the estate would be tied up by litigation, and also because Martha Harris was without the necessary means of support.

The testimony of witnesses as to the amount and value of the community estate of Jim Harris and Mary Harris, at her death, was very conflicting. The main estate consisted in cattle, and the witnesses differed widely in their estimates, both as to number and value of same. Plaintiffs' witnesses placed the number of cattle at from 8000 to 10,000 head, and the value of same at from $80,000 to $100,000; while defendants' witnesses placed the number of cattle at from 500 to 800 head, and the value of same at from $2500 to $8000. The original tax rendition of Jim Harris for the year 1862 was in evidence, and showed his property at that time to consist of 640 acres of land in Collin County, two negroes, forty head of horses and 810 head of cattle, all of the aggregate value of $8720; and evidence was introduced showing the credibility of Jim Harris. J. W. Judy testified that in 1885 he heard Jim Harris say that he recognized the fact that his older children could force him to a settlement at any time they saw fit. J. C. Cobb testified that he heard Jim Harris say, in 1880, that Jesse Harris was interested in the livery business with him, and that his children could force him to a settlement at any time.

It was shown that John B. Harris, one of the executors, had played at cards a few times in the winter of 1894–5, and also once in November, 1895. He admitted that he had played at times with his friends for amusement, but denied that he had ever used any trust funds in gaming, or for any other speculative purpose. Many citizens of Terrell testified as to his qualifications and fitness to wind up the estate of his deceased father, and that his personal integrity was unquestioned.

W. P. Harris was ill at the date of the trial, and had been for some time; but it was shown that all the executors had been acting in harmony in the administration of the trust, and that they had been diligent and faithful in that behalf, and that all funds coming into their hands, by collection or otherwise, had been deposited to their joint credit, as executors of said estate, with the Harris National Bank of Terrell, Texas.

*Opinion.*—This appeal involves the action of the court below only in the matter of the appointment of a receiver. It is not contemplated by the law that we should enter into the consideration and discussion of the merits of the suit in which the receiver has been appointed, in advance of its regular trial, except in so far as it may be found necessary to determine the correctness of the court's action in making such appointment. Quite a number of interesting questions are raised by the assignments of error presented by appellants' counsel, which we have not found necessary to consider in determining this appeal. Without dis-

cussing and deciding the questions relating to the rights of the plaintiffs touching the property involved in this suit, and the power of the court to preserve the property pending the litigation by the exercise of its equity jurisdiction, we will consider whether a proper state of facts has been presented for the exercise of this power, conceding, for this purpose only, that plaintiffs have rights in the property to be enforced, and that the court has the authority to make the appointment. In other words, do the facts presented justify the exercise of the authority to appoint a receiver?

Appellants were named by the testator in his will as his executors; the will had been duly probated; they had accepted and qualified as executors and taken possession and filed an inventory of the property of the estate. They were prima facie at least, entitled to the possession of the property of the estate, and their possession should not be disturbed unless the ends of justice should require the appointment of a receiver. The appointment of a receiver is an equitable sequestration of property, and should only be made when it is clearly manifest to the court that there is danger that the property may be wasted, destroyed, injured or removed out of the jurisdiction of the court pending the litigation; the object in view being to secure the property for the one who may ultimately be ascertained entitled to it, with the least possible injury to all parties concerned. In High on Receivers (3 ed.), section 3, it is said: "The jurisdiction exercised by courts of equity in administering relief by the extraordinary remedy of a receiver pendente lite is a branch of their general preventive jurisdiction, being intended to prevent injury to the thing in controversy, and to preserve it for the security of all parties in interest, to be disposed of as the court may finally direct. The power is justly regarded as one of a very high nature, and not to be exercised when it would be productive of serious injustice or injury to private rights. The exercise of the extraordinary power of a chancellor in appointing receivers, as in granting writs of injunction or ne exeat, is an exceedingly delicate and responsible duty, to be discharged by the court with the utmost caution, and only under such special or peculiar circumstances as demand summary relief. Indeed, the appointment of a receiver is regarded as one of the most difficult and embarrassing duties which a court of equity is called upon to perform. It is a peremptory measure, whose effect, temporarily at least, is to deprive of his property a defendant in possession, before final judgment or decree is reached by the court determining the rights of the parties. It is therefore not to be exercised doubtingly; but the court must be convinced that the relief is needful, and that it is the appropriate means of securing an appropriate end. And since it is a serious interference with the rights of the citizen, without the verdict of a jury and before a regular hearing, it should only be granted for the prevention of a manifest wrong and injury. And because it divests the owner of property of its possession before a final hearing, it is regarded as a severe remedy, not to be adopted save in a clear case, and never

unless plaintiff would otherwise be in danger of suffering irreparable loss."

Do the facts presented show that there is danger that the property will not be preserved in the hands of the executors, so as to respond to the final judgment which shall be rendered in this suit? There are but two facts alleged and proven which are relied upon as pointing to the existence of such danger.

The first is, that the executors have already paid over to the surviving wife of the testator the sum of $15,900 out of the funds of said estate. It clearly appears that the surviving wife had elected not to take under the will, but to receive her community interest in the property of the estate. The estate is a large and valuable one, amounting perhaps, to more than $300,000, practically out of debt, and her interest therein, in any event, would appear to largely exceed the amount paid to her by the executors. She was without present means of support; this very litigation seems to have been apprehended by the executors, and in order to prevent her being embarrased for want of funds, they paid over to her a sum which would seem to be entirely safe for them to advance to her as a beneficiary of the estate out of the $35,000 cash on hand, which was prima facie a community fund. This act does not present to our minds any indication that the executors would probably waste or dissipate the estate during the progress of this suit. To us, it has the appearance of being the exercise of a wise discretion, prompted by the most worthy motives, and should not receive the condemnation of any one, much less those whose relationship should suggest tenderness of regard for the bereaved widow. It would have been unnecessary and cruel to have let the widow suffer for funds while that large estate, which she had helped to accumulate, and in which she was entitled to a large share, was in the hands of the executors. Certainly, this action on the part of the executors furnished no good reason for a court of equity to sequestrate the property of the estate from the executors into whose hands the deceased committed the estate by his last will and testament.

The other fact urged as a reason why the property should not be permitted to remain in the possession of the executors, is that one of the three executors had been seen a few times playing cards and betting upon the game. It is shown that this executor has means of his own, and it is not even alleged, much less proven, that he had used one cent of money belonging to the estate in this way; while he swears he has never used any money of the estate in this, or any other improper way. This executor's character is no other way sought to be impeached, while a large number of the business men, bankers, merchants, lawyers, etc., of Terrell, the town in which he lives, affirm the integrity of his character and his entire fitness for the trust. We do not feel called upon to discuss the question of good morals involved in the charge against the executor, that he wagered upon the game of cards. It is integrity of character, honesty and capacity to administer the trust, that should be

the subject of inquiry. In an action to remove a trustee, and such is the effect of this proceeding, proof that he has been seen to play and wager upon the game of cards, does not furnish a proper basis for his removal. Such facts might be properly considered and given grave weight by a court in considering the matter of selecting a trustee, but standing alone, it does not present sufficient ground for the removal of a trustee already legally constituted.

Aside from this view, this is not a proceeding to remove this particular executor, or to require him to give bond; it is a proceeding to take the property out of the hands of all three of the executors, and place it in the hands of trustees to be selected by the court.

The appointment of a receiver is not the only remedy for the protection of property pending suit. In High on Receivers, section 124, this language is used: ''Where, upon a bill in equity to enforce an interest in a trust fund and for a receiver pendente lite, the court refuses to appoint a receiver, upon condition of defendant executing a bond to account as receiver for all goods and money which have come into his possession, and to pay them over pursuant to the decree of the court, such a bond will be deemed good as a common-law obligation. And the obligator, although not considered as a receiver or · officer of the court, stands in the light of one who, for a personal accommodation, has assumed a legal responsibility, and after receiving the benefits of the obligation, he is estopped from denying its legality.''

Article 1944, Rev. Stats., also provides: ''In cases where no bond has been required of an executor, any person having a debt, claim or demand against the estate, to the justice of which oath has been made by himself, his agent or attorney, or any person interested in such estate, whether in person or as the representative of another, may, by complaint in writing, filed in the court where such will was probated, cause such executor to appear before such court at some regular term and show cause why he should not be required to give bond as such executor.'' See also, Perkins v. Wood, 63 Texas, 398.

We are of the opinion that the court erred in appointing a receiver of the property; and its decree is reversed, with the direction that the receiver be discharged and the property delivered back into the hands of the executors.

*Reversed and receiver discharged*

Delivered March 7, 1896.